In the Matter of the Arbitration Between
**REEVES BROTHERS, INC.,**
Petitioner,

v.

**CAPITAL–MERCURY SHIRT
CORP., Respondent.**

**No. 96 Civ. 9370 (RWS).**

United States District Court,
S.D. New York.

April 24, 1997.

Law Offices of Andrew P. Saulitis, P.C., New York City (Andrew P. Saulitis, of counsel), for Petitioner.

Kantor, Davidoff, Wolfe, Mandelker & Kass, P.C., New York City (Robin Nelson Wolfe, of counsel), for Respondent.

## OPINION

SWEET, District Judge.

Petitioner Reeves Brothers, Inc. ("Reeves") has sought the confirmation of an arbitration award in its favor against Respondent Capital–Mercury Shirt Corp. ("Capital"), which has cross-moved to vacate the award because of an inadequately disclosed relationship between two of the arbitrators and Reeves. For the reasons set forth below, the motion to confirm the award is granted, and the cross-motion to vacate denied.

### Prior Proceedings

The petition and motion to enforce the arbitration award, described below, was filed on December 13, 1996. Capital moved to vacate the award on December 23, 1996, and both motions were heard and considered fully submitted on January 22, 1997.

### The Parties

Reeves is a corporation incorporated under the laws of the State of Delaware, having its principal place of business Spartanburg, South Carolina. Among other things, Reeves manufactures and finishes apparel textiles.

Capital is a corporation incorporated under the laws of the State of New York, having its principal place of business in New York, New York. It operates plants in Gassville and Walnut Ridge, Arkansas. Capital manufactures men's and ladies' shirts which it sells to specialty, department, and chain stores located throughout the United States.

### Facts

### The Arbitration

The underlying controversy involved the manufacture and sale by Reeves of chemically-treated fabric in Bishopville, South Carolina, delivered to Capital in Gassville, Arkansas during 1994. Capital accepted the fabric from which it manufactured men's shirts. Nine invoices for the fabric due between July 22, 1994 and January 16, 1995, in the aggregate of $145,586.51 were unpaid on the basis that certain fabric sold earlier in certain shades was defective.

The Reeves' sales contracts and Capital purchase orders contained a provision for arbitration. The Reeves' contracts provide:

Any controversy arising under or in relation to this order or contract, or modification thereof, shall be settled by arbitration. In the absence of agreement otherwise among the parties hereto such arbitration shall be held in the City of New York in accordance with the laws of the State of New York and the rules then obtaining of the American Arbitration Association, or the General Arbitration Council of the Textile and Apparel Industries, as the party first referring the matter to arbitration shall elect, and the parties consent to the jurisdiction of the Supreme Court of the State of New York, and further consent that any process or notice of motion or other application to the Court or a Judge thereof, and any notice in connection with the arbitration proceedings, may be served with or without the State of New York by registered mail or by personal service provided that reasonable time for appearance is allowed. Judgement upon the award rendered by the arbitrators may be en-

tered in any State or Federal court having jurisdiction thereof.

The Capital purchase orders provide:

Any controversy or claim arising out of, or in any way relating to this contract or the breach thereof, shall be settled by arbitration in New York City, in accordance with the Rules of the American Arbitration Association, and judgment upon any award may be entered in any court having jurisdiction thereof.

On May 25, 1995, Reeves served upon Capital a notice of intention to arbitrate pursuant to N.Y.Civ. Prac. L. & R. § 7503(c), and on or about June 8, 1995, Reeves initiated the arbitration, electing to do so under the General Arbitration Council of the Textile and Apparel Industries ("GAC"), a specialized division of the American Arbitration Association.

Pleadings were served and filed, and three arbitrators were appointed by the GAC in accordance with GAC Rule 13(b). The panel of arbitrators comprised Norman Hackel, chairman ("Hackel"), Norman Katz, and Lawrence H. Bober ("Bober"), who were drawn from the textile/apparel industries.

The arbitration proceeded over a year and a half period. The hearing on the merits of the arbitration spanned eight hearing days, on May 14–16, 1996, July 30–31, August 1 and October 8–9, 1996.

The arbitrators' unanimous award was acknowledged on November 5, 8 and 9, 1996 and delivered to the parties on November 11, 1996 in favor of Reeves, and assessed hearing costs and expenses against Capital and directed Capital to pay Reeves the sum of $178,084.63 within thirty days of transmittal of the award, i.e., by December 11, 1996, and to pay other sums to claimant representing reimbursement of arbitrators' compensation and arbitration expenses.

Capital refused to pay any sums when due under the award "voluntarily," and advised that Reeves would need to seek payment through the judicial process.

The Reeves' petition to enforce the award was filed thereafter as set forth above, followed by the Capital motion to vacate.

### The Relationship Between the Arbitrators and Reeves

Prior to the arbitration, the parties submitted lists of witnesses to the American Arbitration Association ("AAA"). Bober had been employed by Manufacturer's Hanover Trust Co. for about 35 years, holding various offices at different times. During a time that Bober was an officer of that bank, Reeves was a customer of the bank.

Bober disclosed his connection or possible connection to Reeves several weeks after his appointment. Capital applied to the AAA to disqualify him. The application was denied by the AAA. No further disclosure of Bober's relationship with Reeves was made to Capital.

David Browoka was listed as a prospective witness for Reeves. He had been employed by Reeves commencing in approximately 1986 and had been Reeves' president until the spring of 1995 when he became a consultant to Reeves.

On the first day of testimony, on seeing Borowka in the room, Hackel made a statement to the effect that Borowka was an old and close business associate. Nothing further was disclosed. Capital sought to remove Hackel, and officers of the AAA were summoned who spoke with Hackel and denied the Capital application. Capital was given no further information, and the arbitration proceeded.

Subsequent to the arbitration, Reeves has set forth without contradiction from Capital that Bober had no knowledge of Reeves or its account during his service between 1951 and 1987 as an officer of the Manufacturers Hanover and that the relationship between Borowka and Hackel existed during a period in the fifties when Hackel was with United Merchants and Manufacturers, which he left in 1981. Borowka did not testify in the arbitration.

### Discussion

#### 1. The Decision on Disqualification was Binding in the Absence of a Showing of Evident Partiality

Rule 15 of the GAC Rules provides a "Disclosure and Challenge Procedure" in ap-

pointment of arbitrators, under which the GAC makes conclusive determinations as to disqualification issues:

> Any person appointed as neutral arbitrator shall disclose to the Secretary any circumstance likely to affect impartiality, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. The Secretary shall also request, and each party and their representatives shall disclose to the Secretary, any such circumstances known to them. Upon receipt of such information from the arbitrator or another source, the Secretary shall communicate the information to the parties and, if deemed appropriate, to the arbitrator and others. Upon objection of a party to the continued service of a neutral arbitrator, the Secretary shall determine whether the arbitrator should be disqualified and shall inform the parties of the decision, which shall be conclusive.

Under the GAC Rule 29, the arbitrators, or otherwise, the GAC are empowered to interpret and apply the GAC Rules:

> The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties. .... All other rules shall be interpreted by the GAC.

█ Where, as here, the parties have adopted the GAC rules, the parties are also obligated to abide by the GAC's determinations under those rules. *See Koch Oil, S.A. v. Transocean Gulf Oil Co.*, 751 F.2d 551, 554 (2d Cir.1985). In *Koch Oil*, the Second Circuit applied virtually the same rule (AAA Rule 53, which is the counterpart to GAC Rule 49):

> [AAA] Rule 53, allowing some flexibility, gives the arbitrators, and ultimately the AAA, the power to interpret and apply the AAA rules. Thus, if the arbitration agreement obligated the parties to comply with rules 35 and 41, it also obligated the par-

ties to abide by the AAA's determination, at least within reasonable limits, of what constitutes such compliance.

*Id.* at 554.

The GAC Rules are substantially similar (in most cases identical) to the AAA Commercial Arbitration Rules. *See Peters Fabrics, Inc. v. Jantzen, Inc.*, 582 F.Supp. 1287, 1291 (S.D.N.Y.1984) ("although the rules of the GAC and the AAA are not exactly the same, the GAC is the textile division of the AAA and its rules do not differ significantly from those of the AAA;"). The main difference is the way in which the GAC rules provide for specialized arbitrators selected from the "Industry Divisions" in which the parties are engaged. GAC Rule 13(b); *see also* GAC Rules 3, 5.

█ When Capital challenged the respective arbitrators, the established procedures of the GAC for determination of such challenges were followed, specifically, under GAC Rule 15, by which the GAC made the conclusive determination that the arbitrators challenged should not be disqualified.

The GAC review of Capital's complaint apparently found no indication that either of the challenged arbitrators had any direct or indirect financial or personal interest in the outcome of the arbitration, nor of any existing or past financial, business, professional, family or social relationships that were likely to affect impartiality or reasonably create an appearance of partiality or bias. Thus, the relationships did not create grounds for disqualification. Code of Ethics, Canon II(A).

Furthermore, under Canon II(E)(2)[1], disqualification is not absolute, and factors may come into play, such as the challenge being insubstantial, so that the arbitrators could nevertheless act and decide the case impartially and fairly, and that withdrawal would cause unfair delay or expense to another party or would be contrary to the ends of justice. Under Canon II(2)(E), these are matters that the arbitrator himself may de-

---

1. Canon II(E) of the Code of Ethics provides that a challenged arbitrator may remain on a panel: (2) if the arbitrator, after carefully considering the matter, determines that the reason for the challenge is not substantial, and that he or she can nevertheless act and decide the case impartially and fairly, and that withdrawal would cause unfair delay or expense to another party or would be contrary to the ends of justice.

termine, in the first instance. *See also Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 174 (2d Cir.1984) ("[The decision to resign] is better left to the discretion of the individual arbitrator," and they "have an unqualified right to recuse themselves in any matter that they, in their sole discretion, believe might cause their partiality to be questioned."). Here, the arbitrators made the determination that they could properly serve, and swore to do so faithfully and fairly. *See* N.Y. Civ. Prac. L. & R. § 7506.

After the challenges to qualification were determined in accordance with the GAC rules and procedures, Capital fully participated in the arbitration without seeking a stay on the grounds of the qualifications of the arbitrators. As the court noted in *Peters Fabrics,* 582 F.Supp. at 1292, there are "no sound policy reasons why a party should be permitted to profit from a strategic decision to defer seeking a ruling on an arbitrator's authority until after he renders his award, especially since it is clear that had the award been favorable, [defendant] would not now be challenging the authority of the arbitrator." *See also Graphic Arts Int'l Union, Local 97–B v. Haddon Craftsmen, Inc.,* 489 F.Supp. 1088, 1093 (M.D.Pa.1979) ("It is ... well-settled ... that a party may not await an adverse award before asserting objections on grounds of which he had knowledge prior to the award."); *Storey v. Searle Blatt Ltd.,* 685 F.Supp. 80, 82–83 (S.D.N.Y.1988) (denying vacatur where respondent fully participated at hearing after arbitrators determined to proceed, and failed to seek judicial relief until after it had received adverse decision; "At minimum, respondent should have sought judicial relief prior to receipt of the award in order to preserve its objections to an adjournment denial.").

■ Capital has referred to a number of New York cases under the New York Arbitration Act, N.Y. CPLR Art. 75, invoking the choice of law provisions in Reeves' contracts. Both Reeves and Capital's forms contain arbitration clauses, resulting in an agreement as to such term under U.C.C. Section 2–207 ("battle of the forms" provisions), but there is no similar parity as to a choice of law provision.

U.C.C. Section 2–207 states as follows:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants, such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification or objection to them has already been given or is given within a reasonable time after notice is received ...

The pre-printed terms contained in Reeves' purchase order state in paragraph 18 that:

Any controversy arising under or in relation to this order or contract, or modification thereof shall be settled by arbitration in the absence of agreement otherwise among the parties hereto such arbitration shall be held in the City of New York, in accordance with the laws of the State of New York, and the rules then obtaining of the American Arbitration association, or the General Arbitration Council of the Textile and App. Industries.

The pre-printed terms contained in the Capital order state in paragraph 10:

Any controversy or claim arising out of, or in any way relating to this contract or the breach thereof, shall be settled by arbitration in New York City, in accordance with the rules of the American Arbitration Association ...

The clause in Capital's pre-printed Order, by eliminating the choice of law provision, is a term that does "materially alter" the contract within the meaning of U.C.C. Section 2–

207 and therefore no choice of law agreement was ever formed. *See Davidson Extruded Products, Inc. v. Babcock Wire Equipment Ltd.,* 138 Misc.2d 118, 122, 523 N.Y.S.2d 338 (Sup.Ct. Nassau Cty.1987) (arbitration and choice of law provisions materially alter contract and are not binding), *citing Marlene Industries Corp. v. Carnac Textiles, Inc.,* 45 N.Y.2d 327, 333, 408 N.Y.S.2d 410, 380 N.E.2d 239 (1978); *Pacamor Bearings, Inc. v. Molon Motors & Coil, Inc.,* 102 A.D.2d 355, 477 N.Y.S.2d 856 (3d Dept.1984). Accordingly, Federal Arbitration Law applies.

▆▆▆ It is the Second Circuit's policy to read very narrowly the court's authority to vacate arbitration awards pursuant to Section 10 of the FAA. *See Ottley v. Schwartzberg,* 819 F.2d 373, 377 (2d Cir.1987). Any "colorable justification" will support an arbitral award. *Fahnestock & Co. v. Waltman,* 935 F.2d 512, 516 (2d Cir.1991), *quoting In re Marine Pollution Serv., Inc.,* 857 F.2d 91, 94 (2d Cir.1988), and a district court must grant a petition to confirm an arbitration award that is properly brought unless one of the grounds for vacating or modifying the award is established. *Ottley,* 819 F.2d at 376.

The statutory bases for vacating an award, as set forth in the Federal Arbitration Act, are the following:

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite aware upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

Partiality is the only plausible basis upon which this award could be challenged. The leading federal case on partiality and disclosure by arbitrators is *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968). There petitioner sought to vacate an arbitration award when the connection between the arbitrator and respondent was never revealed until after an award had been made. *Id.* at 146, 89 S.Ct. at 338. Here, in contrast, the relationships challenged by Capital were disclosed before the award was issued.

In *International Produce, Inc. v. A/S Rosshavet,* 638 F.2d 548, 551 (2d Cir.1981), the Court of Appeals held that a party seeking to vacate an award must show more than an appearance of bias. Arbitrators are, therefore, held to a lower standard of impartiality than Article III judges. Id. at 552. Thus, in order to vacate the award Capital must establish evident partiality in excess of a mere appearance of bias.

### Capital Has Not Established Evident Partiality

The Court of Appeals has stated that " '[e]vident partiality' means more than a mere appearance of bias." *Florasynth,* 750 F.2d at 173 (citing *International Produce,* 638 F.2d at 552 (2d Cir.1981)). As the Court explained:

As arbitrators are usually knowledgeable individuals in a given field, often they have interests and relationships that overlap with the matter they are considering as arbitrators. The mere appearance of bias that might disqualify a judge will not disqualify an arbitrator.

*Id.* at 173–74.

▆▆▆ The controlling standard in this Circuit for "evident partiality" under § 10(a)(2) is not "appearance of impropriety" as is suggested by Capital. Instead, the Second Circuit explained evident partiality as follows:

[T]he standards for disqualification of arbitrators have been held to be less stringent than those for federal judges. For to disqualify any arbitrator who had professional dealings with one of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all. Mindful of the trade-off between expertise and

impartiality, and cognizant of the voluntary nature of submitting to arbitration, we read Section 10(b) as requiring a showing of something more than the mere "appearance of bias" to vacate an arbitration award. To do.otherwise would be to render this efficient means of dispute resolution ineffective in many commercial settings....

If the standard of "appearance of bias" is too low for the invocation of Section 10, and "proof of actual bias" too high, with what are we left? Profoundly aware of the competing forces that have already been discussed, we hold that "evident partiality" within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration. In assessing a given relationship, courts must remain cognizant of peculiar commercial practices and factual variances. Thus, the small size and population of an industry might require a relaxation of judicial scrutiny, while a totally unnecessary relationship between arbitrator and party may heighten it. In this way, we believe that the courts may refrain from threatening the valuable role of private arbitration in the settlement of commercial disputes, and at the same time uphold their responsibility to ensure that fair treatment is afforded those who come before them.

*Morelite Constr. Corp. v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 83–84 (2d Cir.1984) (citations omitted).

The "reasonable person standard require[s] more than speculation that amounts to a claim that there is an appearance of bias.'" *Local 814, Int'l Brotherhood of Teamsters v. J & B Sys. Installers & Moving, Inc.*, 878 F.2d 38, 41 (2d Cir.1989).

■ Capital has relied upon *Commonwealth Coatings* in which an award was vacated when a supposedly neutral arbitrator, an engineering consultant, was discovered to have an undisclosed business relationship with the successful party to the arbitration. It was also shown that "one of his regular customers in this business was the prime contractor that petitioner sued in this case."

393 U.S. at 146, 89 S.Ct. at 338. In fact, the arbitrator had been paid approximately $12,-000 by the party in consulting fees, and the relationship "went so far as to include the rendering of services on the very projects involved in [the arbitration]." *Id.* at 146, 89 S.Ct. at 338. *Commonwealth Coatings* is distinguishable from this case, in which the arbitrators did make disclosures and the relationships involved were quite coincidental and removed.

Further, in *Morelite Constr. Corp.*, the Court of Appeals specifically noted that in *Commonwealth Coatings* the Supreme Court "attempted to resolve the issue [of what constitutes 'evident partiality' by an arbitrator], but the result of that decision appears to be ongoing uncertainty." 748 F.2d at 82. Against that "murky backdrop of Supreme Court precedent," the Second Circuit examined prior decision in this Circuit, and announced the applicable standard that "'evident partiality' within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration" assessed against the "peculiar commercial practices and factual variances" of the particular arbitration. *Id.* at 82–84.

In *International Produce*, 638 F.2d at 551, the fact that a neutral arbitrator was also a witness in another arbitration involving the same law firms representing the parties in the arbitration in question did not provide grounds for vacating the award on the basis of his "evident partiality." *Id.*, 638 F.2d at 551. The Court, per the Honorable J. Edward Lumbard, stated that "the Supreme Court in *Commonwealth Coatings* did not expand the § 10 standard of 'evident partiality' to include 'appearance of bias.'" *Id.* The Court also noted, in any event, that even an "'appearance of bias' seems to us, at best, to be speculation without substance." *Id.* (citation omitted).

Finally, Capital has cited no instance of prejudice other than hypothesizing that it was "inferentially prejudiced" by the fact that the award was in Reeves' favor. The Second Circuit has stated "the fact that the arbitrator found in favor of the [other party] clearly does not satisfy [the movant's] burden

of showing partiality" under section 10 of the Federal Arbitration Act. *Thomas C. Baer, Inc. v. Architectural & Ornamental Iron Workers Local Union No. 580, etc.*, 813 F.2d 562, 565 (2d Cir.1987) (citing *Bell Aerospace Co. Division of Textron, Inc. v. Local 516, International Union, UAW*, 500 F.2d 921, 923 (2d Cir.1974)). Here, as in *Thomas C. Baer*, "[t]here is absolutely no evidence that the arbitrator acted out of any improper motives or was predisposed to favor either party." *Id.*; *see also Cook Chocolate Co. v. Salomon, Inc.*, 748 F.Supp. 122, 126 (S.D.N.Y.1990) (rulings against movant, even if incorrect, insufficient to establish partiality), *aff'd,* 932 F.2d 955 (2d Cir.1991).

Capital has claimed that the arbitrators failed to provide "full" disclosure, though it does not suggest what such "full" disclosure might have been. A similar argument made in *Cook Chocolate* was rejected. 748 F.Supp. at 129 ("While it may be true that full disclosure in this area would have been preferable, the arbitrator's actions fall short of what is typically required to make out a claim of bias."). And unlike *Cook Chocolate*, the arbitrators here did make disclosures, which were dealt with under the rules of the tribunal, thus binding the parties as discussed above.

### Conclusion

The motion of Reeves to confirm the award is granted, and the motion to vacate the award by Capital is denied.

Submit judgment on notice.

It is so ordered.